**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **NELLIE MOORE** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 10 C 7972** |
| | ) | |
| **v.** | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner** | ) | |
| **of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

The plaintiff, Nellie Moore, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§423(d)(2). Ms. Mueller asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

**I.**
**PROCEDURAL HISTORY**

Ms. Moore applied for DIB on December 26, 2007, alleging that she has been disabled since January 1, 2001, due to hereditary hemolytic anemias – or sickle cell anemia – and discogenic and degenerative disorders of the back (Administrative Record ("R") 45, 80). Her application was denied initially and upon reconsideration. (R. 51, 58). Ms. Moore then filed a timely request for hearing in pursuit of her claim on August 5, 2008. (R. 60).

An administrative law judge ("ALJ") convened a hearing on August 5, 2009, at which Ms. Moore, not represented by counsel, appeared and testified. (R. 24-44). At this hearing, James Radke testified as a vocational expert. (R.40-43). On January 4, 2010, the ALJ issued an

unfavorable decision, denying Ms. Moore's application for DIB because she retained the capacity to perform her past sedentary work as a general office clerk. (R. 15-20). The ALJ's decision became the Commissioner's final decision on October 18, 2010, when the Appeals Council denied Ms. Moore's request for review. (R. 1-3). See 20 C.F.R. §§404.955; 404.981. Ms. Moore appealed that decision by filing suit in this Court under 42 U.S.C. §405(g), and both parties consented to jurisdiction here pursuant to 28 U.S.C. §636(c).

## II.
## THE RECORD EVIDENCE

### A.
### The Vocational Evidence

Ms. Moore was born on April 18, 1961, making her forty-nine years old at the time of the ALJ's decision. (R. 45). She finished a semester of college, but has no other vocational or specialized training. (R. 29). Ms. Moore is 5' 2" tall and weighs 217 pounds. (R. 28). She has work experience in a commercial bakery, in data entry, and general office work. (R. 41). For the purpose of receiving DIB, Ms. Moore's insured status expired September 30, 2003. (R. 45). She has to prove she was disabled prior to that time. 42 U.S.C. §423(c); *Martinez v. Astrue*, 630 F.3d 693, 699 (7th Cir. 2011).

### B.
### The Medical Evidence

Ms. Moore contends that she is eligible for DIB due to her sickle cell anemia. *(Plaintiff's Brief*, at 2).[1] Additionally, she contends that she is obese and has hypertension, which should be taken into account as well. (*Plaintiff's Brief*, at 10-13)

As it stands now, the record, although voluminous, contains precious little evidence to demonstrate what Ms. Moore's condition was prior to September 30, 2003. In fact, in her brief, Ms. Moore is able to unearth just three pages of medical notes pertaining to that time from the

---

[1] Ms. Moore did not bother to number the pages in her briefs, so the EC/MF pages are used here.

600-page medical record.  (*Plaintiff's Brief*, at 3, 11).  On March 12, 2001, Ms. Moore was suffering from a bout of bronchitis.  (R. 587-88).  Her doctor noted that her blood pressure was stable and that she had  sickle cell disease.  (R. 587-88).  By April 3rd, Ms. Moore's bronchitis had resolved and she was in no pain; her blood pressure was again within normal limits.  (R. 588).  On April 25th, Ms. Moore had a follow-up examination for her sickle cell disease.  At the time, the doctor noted that his "pt feels fine [no] complaints," but said her typical crisis pain occurred in all joints.  (R. 589).  Ms. Moore had a normal echocardiogram on May 4th.  (R. 603).  On August 31st, Ms. Moore had a check up for her blood pressure, which was 132/94.  She denied any problems with dizziness or vison; she had no edema.  (R. 594).  On September 14th, her blood pressure was 128/76 and, again, she was asymptomatic. (R. 594).  Also in September, Ms. Moore was diagnosed with a cataract in her right eye.  (R. 616).  Vison was normal in her left eye but 20/50 in her right.  (R. 608).  With a small myopic shift, she was able to see 20/30. (R. 608).  It was determined that she would be treated conservatively.  (R. 616).

That appears to be all the medical evidence from the time prior to September 2003.  It's certainly all the evidence – actually more – that Ms. Moore cites in her brief.  After 2001, there is no record of any treatment until 2005.  In January of that year, Ms. Moore had an appointment for a check up with a new doctor.  She related how she worked out of her home scheduling appointments for her husband's carpet cleaning business.  (R. 226).  She had no pain or distress; blood pressure was 120/84 and "well controlled on current medications." (R. 226-27).  In November of 2005, Ms. Moore sought treatment for right wrist pain that she thought was due to sickle cell crisis.  Hematology revealed it was unrelated. (R. 222). She had a full range of motion in her wrist and some mild tenderness.  Blood pressure was normal and it was noted that her hypertension was benign. (R. 222-223).  She was diagnosed with DeQuervain's tenosynovitis –

an inflammation of the thumb tendons – and given a splint. (R. 223). About a month later, she had a steroid injection. (R. 449). At that time, she still had full range of motion and mild tenderness. (R. 449). Ms. Moore points to no other evidence in her brief. (*Plaintiff's Brief*, at 14, n.10). She cites no record of any treatment for a sickle cell crisis at any time. Although she claims there is evidence in the record that her blood pressure and obesity exacerbate her condition, the evidence she cites says nothing of the kind. (*Plaintiff's Brief*, at 3-4, citing R. 164, 166, 589, 592-94). Hypertension is invariably referred to as benign. And, although Ms. Moore is clearly obese at about 200 pounds, no doctor appears to have referred to it as an issue – certainly not in any of the records Ms. Moore cites.

The only mentions of any treatment for sickle cell crisis – and indeed, any reference to a specific incident whether treatment was sought or not or whether sickle cell crisis was confirmed or not – comes from the Commissioner's brief. In August of 2006, Ms. Moore had right hip pain caused by a trip to St. Louis where the heat was extreme. (R. 369). There was no weakness or numbness, or pain with rotation of the hip. (R. 372-73).

Ms. Moore complained of sickle cell crisis manifesting as right shoulder pain in January 2007. (R. 299). At the time, it was said she had infrequent admissions for crises, but that they had become more common in the previous year. (R. 297, 209). In August of 2007, Ms. Moore sought treatment for a sickle cell crisis. It was precipitated by an upper respiratory infection and manifested as pain in her right hip. She had a full range of motion in her hip without discomfort. (R. 216). She was hospitalized for three days until the pain was tolerable on over the counter analgesics. (R. 214-15). Again, her hypertension was characterized as "benign" at that time. (R. 216). In October of 2007, the treating physician opined that Ms. Moore was ambulatory and able to carry out light or sedentary work. (R. 512-14). She denied any recent sickle cell crises. (R. 514). She was again said to be capable of sedentary or light work in November 2005. (R. 519). In December of 2007, Ms. Moore complained of tingling in her arms and legs, and felt she

was having a sickle cell crisis. Her pain was 6 or 7 out of 10, and she refused pain medication because it was not significant enough. (R. 273). She had normal range of motion in her extremities and normal gait, strength, and sensation. (R. 275). There was no clear lateralization of symptoms and the treating physician felt she was not in pain crisis. (R. 275).

At the end of September 2007, Ms. Moore was admitted to the hospital due to a pulmonary emboli, causing shortness of breath and chest pain. (R. 305). The Agency arranged for Ms. Moore's medical evidence to be reviewed by Dr. Virgilio Pilapil on February 20, 2008, but he determined that there was insufficient evidence from the period before Ms. Moore's insured status expired to determine the severity of her impairments during that time. (R. 554-556). In December 2008, Ms. Moore was diagnosed with pneumonia, and medication was prescribed. (R. 268).

## C.
## The Administrative Hearing Testimony

### 1.
### The Plaintiff's Testimony

At the outset of Ms. Moore's hearing, the ALJ explained to Ms. Moore that, because she was applying for DIB and her insured status expired September 30, 2003, she would have to prove she was disabled before that date in order to receive benefits. (R. 26). The ALJ then spoke to Ms. Moore about her right to representation. (R. 27). Specifically, she informed Ms. Moore that it may be to her benefit to obtain representation because it could help her present a case that was most favorable to her. (R. 27). The ALJ said a representative could "help [Ms. Moore] obtain information regarding [her] claim, explain medical terms and explain the proceedings that occur before [the ALJ]." (R. 27). The ALJ explained that a representative can only charge a fee if it is authorized by the SSA, and that there may be certain legal organizations

that could help Ms. Moore for free if she met their requirements. (R. 27). The ALJ then asked if Ms. Moore would like her hearing postponed so she could talk with a representative, and took care to tell Ms. Moore that "[i]f after the hearing [she wasn't] happy or [she was] not 100 percent satisfied with the decision that's not the time to say, gee, I wish I had talked to somebody about my case." (R. 28). Ms. Moore said she didn't want a continuance and wanted to proceed without representation. (R. 28).

Ms. Moore testified that she lived in a two-storey house with her husband and foster child. Her husband worked and they received $444 per month for the child. (R. 29). She was "in a lot of pain" and had difficulty bending and balancing. (R. 33). When asked how far she could walk, Ms. Moore testified that she could walk "probably a block" before she needed to stop and catch her breath. (R. 32). She stated that she could stand on her feet for thirty minutes before her hips bothered her, and that she could sit for about an hour before she needed to get up and walk. (R. 32). She thought she could lift about 25 pounds. (R. 32). She had a little difficulty climbing stairs and bending sometimes. (R. 32-33). She had no trouble using her hands. (R. 33). She got up every hour at night to let her blood circulate. (R. 33). She had been doing that for the last fifteen years. (R. 34). She said she was in pain every day but the real bad crises would come with the temperature changing from hot to cold or vice versa. (R. 34). She explained that she went to the hospital five times in 2008, and at least four times in 2009. (R. 35). She couldn't remember how often she went to the hospital in 2001, but she assured the ALJ she had medical records going back that far. (R. 35). She stated that her medications helped her and that they had no side effects. (R. 36).

Ms. Moore was able to go to the grocery store for a few items but her daughter did the major shopping. (R. 36). Ms. Moore did a little dishwashing – a few cups and bowls – and her daughter did the laundry. (R. 36). Ms. Moore didn't do any sweeping, mopping, vacuuming, or yard work. (R. 37). She spent most of the day watching TV or talking on the phone. (R. 37).

When the ALJ asked her if there was anything else she wanted to tell her, Ms. Moore said that she believed she had covered it. (R. 40).

Ms. Moore said that her sickle cell caused pain in her hips, which she had been experiencing since she was little. (R. 39). She has had eight surgeries due to her disease. (R. 40). She missed work when she was working due to her disease. (R. 40). When the ALJ asked Ms. Moore if she wanted to tell her anything else about her condition, Ms. Moore said, no, she believed they had covered it. (R. 40).

At the conclusion of the hearing the ALJ told Ms. Moore that there was no medical evidence dealing with the time period before September 30, 2003, and that such evidence would be important to her case because of the expiration of her insured status. (R. 43). The ALJ asked Ms. Moore whether she could get any evidence from that time, and said she would leave the record open for thirty days. (R. 44). The ALJ also told Ms. Moore to call if she had difficulty getting the evidence because they could get the evidence for her if the hospital was being uncooperative. (R. 44).

## 2.
### The Vocational Expert's Testimony

The vocational expert ("VE"), Mr. Radke, testified that, as a raisin sorter in a commercial bakery, Ms. Moore was doing light, unskilled work. (R. 41). Her data entry work was sedentary and semiskilled. (R. 41). Mr. Radke also testified that, in her work assisting with college scholarships, Ms. Moore was doing sedentary work that was semiskilled. (R. 41).

The ALJ asked whether an individual limited to carrying twenty pounds occasionally and ten pounds frequently, who could stand or walk for six out of eight hours and must avoid exposure to extreme temperature could perform any of Ms. Moore's past work. (R. 41-42). The VE stated that the hypothetical individual would be able to perform her general office clerk

position of doing data entry work. (R. 42). He further stated that in the northeastern Illinois area, there were "5,400 mail clerks, 9,300 maid positions, 5,600 hand packers, and 34,500 cashier positions" that also fit those restrictions. (R. 42). When the ALJ changed the hypothetical so that the person could only stand or walk for two out of eight hours, the VE said that there were "1,400 hand packers in this region, 900 order clerks and 3,700 general office [clerks]" that this person could perform. (R. 42). However, if the person were to miss four days per month, she would not be able to sustain employment. (R. 42).

## III.
## THE ALJ'S DECISION

The ALJ noted that Ms. Moore last met the insured status requirement on September 30, 2003, and that she has not worked from her alleged onset date of January 1, 2001 through September 30, 2003. (R. 17). The ALJ then reviewed the medical evidence and found that Ms. Moore's sickle cell anemia was a severe impairment, but that there was no evidence that it met the listings before or on the date that she was last insured. (R. 17). *See* 20 C.F.R. §§404.1520(d), 404.1525, 404.1526. The ALJ determined that, despite Ms. Moore's medical impairments, she was able to perform light work, as defined in 20 C.F.R. 404.1567(b) and 416.967(b), subject to the restriction against more than occasional kneeling, stooping, crouching, crawling, and no climbing ropes, ladders, scaffolds, ramps, or stairs. ( R. 17). These limitations also include a sit-stand option and avoiding exposure to extreme temperatures. (R. 17). In making this determination, the ALJ considered all of Ms. Moore's symptoms, along with the medical evidence, including the opinion evidence. (R. 18). The ALJ discussed Ms. Moore's past work history and her limitations in standing, walking, and sitting. (R. 18). She noted that she can only stand for thirty minutes and that her walking is limited to only one block before she has to stop to catch her breath. (R. 18). She also discussed Ms. Moore's sickle cell crises, which happened four or five times a year in 2008 and 2009. (R. 18). She noted that she takes medications for the

pain caused by the crisis, and that her daughter helps her with laundry and taking out the garbage. (R. 18).

The ALJ indicated that she considered Ms. Moore's complaints in accordance with the regulations and Social Security rulings. (R. 18). She found that Ms. Moore's medically determinable impairments did not meet or were not a medically equal impairment in Appendix 1 and allowed light work subject to postural limitations, and that her description of the intensity, persistence, and limiting effects of the symptoms were not entirely credible. (R. 18). She explained that Ms. Moore was not persuasive, and that "most of the medical evidence is dated well after the DLI." (R. 19). The medical record did not reflect any work limitations stemming from her hip pain. (R. 19). The ALJ then noted that Ms. Moore would be able to perform the jobs of cashier, mail clerk, maid, and hand packer – jobs that exist in significant numbers in the economy. (R. 19). Thus, the ALJ concluded that she was not disabled under the Act. (R. 20).

**IV**.
**DISCUSSION**

**A.**
**The Standard of Review**

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009). Substantial evidence means relevant evidence that a reasonable mind might accept to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1428 L.Ed.2d 842; *Binion v. Chater*, 108 F.3d 780,782 (7th Cir. 1997).

In these cases, the standard of review is deferential, and the court may not make independent credibility determinations or reconsider facts and evidence. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Connour v. Barnhart* 42 Fed.Appx. 823, 827 (7th Cir. 2002). Even if reasonable minds may differ as to whether the plaintiff is disabled, the court must affirm the ALJ's decision if it is supported by substantial evidence. *Books v. Chater*, 91 F.3d. 972, 978 (7th Cir. 1996). However, conclusions of law are not entitled to such deference and, if the ALJ commits an error of law, the decision must be reversed. *Schmidt v. Astrue*, 496 F.3d 833,841 (7th Cir. 2007).

In his decision, the ALJ must "minimally articulate" the reasons for his ultimate conclusion by "building an accurate and logical bridge from [the] evidence to [the] conclusion." *Zurawski v. Halter,* 245 F.3d 881 (7th Cir. 2001); *Clifford*, 227 F.3d at 872. The Seventh Circuit has said that this is a "lax" standard. *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). The ALJ does not need to address every piece of evidence, but she cannot subjectively limit her discussion of the evidence to only that which supports her conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). All that is required is that the ALJ "articulate at some minimum level his analysis of the evidence" so that the court can assess the validity of his findings and provide a meaningful review. *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988).

**B.**

**The Five-Step Sequential Analysis**

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997).

## C.
## ANALYSIS

Ms. Moore raises several criticisms of the ALJ's decision. First and foremost, she contends that the ALJ failed to obtain a valid waiver of representation from her and that, therefore, the Commissioner has the burden of demonstrating that the ALJ fully developed the record. *See Skinner v. Astrue*, 478 F.3d 836, 841-42 (7th Cir. 2007). In order to insure a *pro se* litigant has given a valid waiver, an ALJ must explain that (1) having an attorney present may help with the proceedings; (2) there is a possibility of free counsel or a contingency fee; and (3) attorneys fees are limited to twenty-five percent of past due benefits and require court approval. *Binion v. Shalala*, 13 F.3d 243, 245 (7th Cir. 1994); *Skinner*, 478 F.3d at 841.

Here, Ms. Moore contends only that the ALJ did not discuss the limitation of attorney fees or the required court approval. (*Plaintiff's Brief*, at 6). Actually, the ALJ did tell Ms. Moore that any fee an attorney charged her would have to be approved by the Social Security Administration. (R. 27). The ALJ also explained how a representative could help her with her

case and that she might be able to obtain one at a reduced rate or even free of charge. (R. 27). All the ALJ failed to do at the hearing was specifically tell Ms. Moore that the highest any fee could be was twenty-five percent of her past due benefits. The Seventh Circuit is a stickler for that point being addressed very specifically. *See Binion,* 13 F.3d at 245 (concluding that the claimant's waiver was invalid because, though the ALJ provided the rest of the required notice, the ALJ failed to explain the twenty-five percent cap to the claimant).

The requirement goes beyond what is mandated in the section of the applicable statute covering "Notification of options for obtaining attorneys":

> The Commissioner of Social Security shall notify each claimant in writing, together with the notice to such claimant of an adverse determination, of the options for obtaining attorneys to represent individuals in presenting their cases before the Commissioner of Social Security. Such notification shall also advise the claimant of the availability to qualifying claimants of legal services organizations which provide legal services free of charge.

42 U.S.C.A. § 406(c). This language was added to the Act effective January 1, 1991.[2] That was after the Seventh Circuit required specific notice of the 25-percent limitation, apparently in an effort to fill a gap that existed in the prior version of the statute. *See Thompson v. Sullivan*, 933 F.2d 581, 584 (7th Cir. 1991)(citing *Smith v. Schweiker,* 677 F.2d 826, 828-29 (11th Cir.1982)).[3] Since the new language took effect, however, Seventh Circuit cases on waiver have made no

---

[2] The Second Circuit noted this in *Lamay v. Commissioner of Social Sec.*, 562 F.3d 503 (2nd Cir. 2009), where it decline to apply the Seventh Circuit's stringent requirements in light of the statute's specific instructions to the Commissioner – and hence, to ALJs – on obtaining a valid waiver of counsel. The court "believe[d] that the creation of statutory notice requirements in Sections 406(c) and 1383(d)(2)(B/D) supplanted prior judicially-created standards and that the statutory requirements are all that we can apply." 562 F.3d at 507. The Ninth Circuit took a similar tack in *Roberts v. Comm'r of Social Sec. Admin.*, 644 F.3d 931, 933-34 (9th Cir. 2011).

[3]The requirement was taken, not from any provision regarding waiver, but apparently from the fee provision in §406(b)(1)(A):

> Whenever a court renders a judgment favorable to a claimant under this subchapter who was represented before the court by an attorney, the court may determine and allow as part of its judgment a reasonable fee for such representation, not in excess of 25 percent of the total of the past-due benefits to which the claimant is entitled by reason of such judgment . . .

mention of §406(c)'s specific waiver provision.  Ratulowski v. Astrue, 380 Fed.Appx. 552, 554, 2010 WL 2464996, *1 (7th Cir. 2010); *Million v. Astrue*, 260 Fed.Appx. 918, 920, 2008 WL 186935, *2 (7th Cir. 2008); *Skinner*, 478 F.3d at 841; *Ferguson v. Barnhart*,  67 Fed.Appx. 360, 365, 2003 WL 21259753, *5 (7th Cir.  2003); *Thomas v. Barnhart*, 54 Fed.Appx. 873, 877, 2003 WL 77202, *3 (7th Cir. 2003); *Williams v. Barnhart*, 35 Fed.Appx. 267, 268, 2002 WL 977129, *1 (7th Cir. 2002);  *Binion*, 13 F.3d at 245.

Nevertheless, the requirement that a claimant be informed of the 25-percent limitation lives on in the Seventh Circuit and the ALJ failed to specifically mention it.  The 25-percent limitation was, however,  made clear in the packet Ms. Moore received along with the notice of her hearing.  Included in that mailing was a two-page pamphlet entitled "Your Right To Representation," which explained the right to counsel, the benefits of representation, and limitations on fees – including the 25%-limitation – in rather simple and straightforward language.  (R. 68-69).  Ms. Moore signed and returned a receipt indicating she had received the packet and would be appearing at her hearing.  (R. 79).  The question is whether written notice, combined with a signed and returned acknowledgment of receipt, satisfies the Seventh Circuit standard.

The court hasn't addressed this question, but in *Skinner*, it indicated that the Commissioner's written notice did not fully inform the claimant of the information the Seventh Circuit required.  The written notice in *Skinner* failed to mention the 25-percent fee limitation and did not elaborate on the advantages of counsel.  *Skinner v. Astrue*, No. 03-9068 (N.D.Ill. June 29, 2005, Memorandum Opinion and Order, at 9).  As the Seventh Circuit did not say that any written notice would be insufficient, presumably one that met all their requirements would pass muster.  Just such a notice came under scrutiny in  *Smith v. Astrue,* 795 F.Supp.2d 748,

2011 WL 2470877, at *7 (N.D.Ill. June 21, 2011). The notice in that case appears to have been identical to the one Ms. Moore received, informing the claimant of all of the information the Seventh Circuit deems crucial. 795 F.Supp.2d at 794-95. Like Ms. Moore, the claimant in *Smith* signed and returned a receipt for the notice. 795 F.Supp.2d at 795. The court found that the waiver was valid.

Given the uncomplicated yet thorough language of the notice here, the receipt Ms. Moore signed, and the suggestion in *Skinner* that a comprehensive written notice would be adequate, there was a valid waiver of counsel here. That should be the end of the matter, but Ms. Moore says that, unlike the claimant in *Smith*, she has submitted an affidavit to the court stating that she did not fully understand her waiver of counsel. (*Plaintiff's Brief*, at 2). But the affidavit is woefully insufficient to make a case for that assertion.

First of all, Ms. Moore lies in the very first paragraph of the affidavit. She claims the ALJ did not inform her how an attorney would aid her in her Disability Hearing. (*Plaintiff's Brief*, Ex. 1, ¶ 1). As already noted the ALJ did explain how an attorney could help. Specifically, she said that:

> A representative can help you obtain information regarding your claim, explain medical terms and explain the proceedings that occur before me. . . . a representative can help you present your case that's most favorable to you.

(R. 27). Ms. Moore told the ALJ that she understood but, even so, the ALJ gave her one more chance, cautioning her against waiting until after the hearing to decide she should have spoken to an attorney about her claim. (R. 28). Undaunted, Ms. Moore chose to go it alone. If that were not enough, as already noted, the written notice provided Ms. Moore with a longer list of what a lawyer could do for her:

> Getting information from your Social Security file;

> Helping you get medical records or information to support your claim;

> Coming with you, or for you, to any conference or hearing you have with us;

Requesting a reconsideration, hearing or Appeals Council review; and

Helping you and your witnesses prepare for a hearing and questioning any witnesses.

(R. 68).

Ms. Moore makes a couple of other misrepresentations in the affidavit. She claims that the ALJ "informed [her] that if [she] chose to proceed with the hearing unrepresented, [the ALJ] would help [her] obtain all the medical and non-medical records." (*Plaintiff's Brief*, Ex. 1, ¶ 16). Actually, the exchange went this way. At one point in the hearing, Ms. Moore indicated that she couldn't remember her trips to the hospital in 2001, but could look up her old records. (R. 35). Then, near the close of the proceedings, the ALJ told her old records were important:

> ALJ: Okay, we don't have those on the file and those might be important to us because I said your date last insured is September 30, 2003. So we're trying to look for evidence that's dated before then.
>
> Ms. Moore: Okay
>
> ALJ: So do you think you can get that for us?
>
> Ms. Moore: Well, I can try to call the hospital and ask for any records.
>
> ALJ: Okay. Let me tell you what we'll do. I'm going to leave what I call the record open for a month, 30 days.
>
> Ms. Moore: Okay.
>
> ALJ: And you see what you can do, Okay?
>
> Ms. Moore: Um-hum.
>
> ALJ: And then if you have any difficulty give us a call –
>
> Ms. Moore: Okay.
>
> ALJ: – and say, you know, because we may be able to get them instead of you if they're not going to be willing to – you know, sometimes they're not cooperative or whatever.

Ms. Moore: Right.

ALJ: Just give us a call and let us know, okay?

Ms. Moore: Okay.

(R. 43-44).

Ms. Moore never contacted the hearing offices. If she had, she surely would have included that tidbit in her affidavit. As such, with no contact from Ms. Moore the ALJ was entitled to assume that since Ms. Moore had had no trouble collecting records from before September 2003 there simply weren't any. Ms. Moore does not have a mental impairment, *cf. Spiva v. Astrue*, 628 F.3d 346, 352 (7th Cir. 2010), and, in fact, is an intelligent woman with a year of college education. At the hearing, Ms. Moore clearly indicated that she understood what the agenda was to be – she would do her best and ask for help if she needed it. Now because she chose not to contact the ALJ, she not only cries foul, but presents a completely inaccurate version of what the ALJ said.

Ms. Moore also claims that the ALJ did not tell her that she should get records from prior to September 30, 2003. (*Plaintiff's Brief*, Ex. 1, ¶ 17). This is another falsehood. As was just detailed the ALJ specifically said that Ms. Moore's "date last insured is *September 30, 2003.* So we're trying to look for evidence that's *dated before then*." (R. 43 (emphasis supplied)). It's possible that Ms. Moore may not have understood "date last insured," but unlikely because the ALJ explained it to her at the beginning of the hearing. The ALJ told Ms. Moore:

> Now in your case . . . your date last insured is September 30, 2003. In order to be found disabled for the purpose of those benefits you would have to establish you became disable on or before September 30, 2003.

(R. 26). It could not be much clearer and, again, Ms. Moore is not unintelligent. So she must have understood that, and certainly must have understood what "before then" meant, as in "before September 30, 2003."

16

As for the validity of her waiver of representation, nowhere in her affidavit does Ms. Moore say that she did not understand the written notice she acknowledged receiving. She does say that if she had an attorney "certain facts would have been brought to light through her testimony." (*Plaintiff's Brief*, Ex. 1, ¶ 2). Most of these facts, however, did come out at the hearing and the ALJ mentioned them in her review of Ms. Moore's complaints: sickle cell crises are caused by changes in weather (R. 16, 34); she has had crises her whole adult life (R. 18, 39); she had hip pain every day (R. 18, 32, 39); she cannot sit for more than an hour (R. 18, 32); she can stand for 30 minutes before her hips hurt (R. 18, 32); she cannot walk or stand for two hours in a workday (R. 18, 32); she takes medications when she has a crisis (R. 18; 36). This, once again, is a mischaracterization of what has gone on in this case. *See Nelson v. Apfel*, 131 F.3d 1228, 1236 (7th Cir. 1997)(even a "marginal hearing" was sufficient to develop the areas claimant argued were not addressed).

It seems that lies and mischaracterizations in a sworn affidavit is Ms. Moore's response to the denial of her claim for lack of evidence. "The legal system offers many ways to deal with problems; perjury is not among them." *Escamilla v. Jungwirth*, 426 F.3d 868, 870 (7th Cir. 2005). Perjury, as Judge Posner has said, is a fraud on the court. *Allen v. CTA*, 317 F.3d 697, 703 (7th Cir. 2003). It strikes at the heart of the integrity of the judicial system and is incompatible with the values underlying any system of justice. *See United States v. Mandujano*, 564, 425 U.S. 576 (1976); *United States v. Kennedy*, 372 F.3d 686, 695 (4th Cir. 2004). Ms. Moore's affidavit fails to advance her claim that she did not make a valid waiver of representation. All it does is reflect poorly – very poorly – on her credibility. That leads one to believe that the ALJ had it right when she wrote that she found Ms. Moore "unpersuasive."

Her waiver being valid, it's up to Ms. Moore to prove that the ALJ failed to fully develop the record. A court generally upholds the reasoned judgment of the Commissioner on how much evidence to gather, even when the claimant lacks representation. *Nelms v. Astrue*. 553 F.3d 1093, 1098 (7th Cir. 2009); *Binion,* 13 F.3d at 246. As such, it takes "a significant omission . . . before [a] court will find that the [Commissioner] failed to assist *pro se* claimants in developing the record fully and fairly." *Luna v. Shalala,* 22 F.3d 687, 692 (7th Cir. 1994). "Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand." *Binion,* 13 F.3d at 246. In order to obtain a remand for failure to develop the record, "a claimant must set forth specific, relevant facts – such as medical evidence – that the ALJ did not consider." *Nelms*. 553 F.3d at 1098; *see also Nelson,* 131 F.3d at 1235; *Binion,* 13 F.3d at 245.

Here, Ms. Moore points to no medical evidence that might have supported her claim that she was disabled before September 30, 2003. She simply claims the ALJ did not obtain any medical records from the pertinent time. (*Plaintiff's Brief*, at 9; *Plaintiff's Reply*, at 4-5). This begs the question whether there are any. In the wake of the ALJ's decision, Ms. Moore submitted an additional 150 pages or so of medical records to the Appeals Council. (R. 4-5; 623-760). Not a single one dates from before September 30, 2003. Instead, they cover a period from 2006 through 2010 – three to seven years after the expiration of Ms. Moore insured status. It's not clear whether Ms. Moore was represented at that time, but she has had an attorney at least since December 15, 2010. (Dkt. # 3). Still, in the fourteen months since then, there has been no evidence unearthed from the critical period despite the assistance of counsel. And it is up to Ms. Moore to point to some evidence to make out her claim that the ALJ didn't fully develop the record. *Nelms*. 553 F.3d at 1098. But there is no mention of anything in her briefs.[4]

---

[4] Ms. Moore does claim that "her condition necessitated an emergency room visit during the time at issue" (*Plaintiff's Brief*, at 9), but one trip to an emergency room for treatment over the course of two or three

(continued...)

The cache of documents presented to the Appeals Council includes a short letter, dated June 26, 2010, from Dr. Kevin Barton, who treats Ms. Moore for sickle cell disease. (R. 760). He writes that, as of that time, Ms. Moore's "pain crises have been more frequent" and that "[s]he is currently unable to work because of her cardiopulmonary symptoms." (R. 760). The letter says nothing about her condition or her ability to work before September 2003. In October and November of 2007, Ms. Moore's physicians said she could perform light or sedentary work. (R. 512-14, 519). Those opinions, being far closer in time to the critical period are a much better indicator of Ms. Moore's capacity for work prior to the expiration of her insured status, especially when one considers the fact that her physicians, including Dr. Barton, have indicated that her condition has gotten worse over time.

So, essentially, Ms. Moore wants a remand because, she concludes, the ALJ did not develop the record properly. But in what way did the ALJ fail? Not surprisingly, Ms. Moore's brief does not say. Where was his search to begin and how broad should it have been? Would hospitals in Chicago have sufficed? Or would such a search have been too limited? What doctors should have been consulted? These are questions that would have vexed any gumshoe, and proven unanswerable to any ALJ. And so it is not surprising that Ms. Moore's brief does not explain how the ALJ could have helped her when she withheld from her the very information essential to any further development of the record.

While an ALJ does have a heightened duty to develop the record when a claimant is unrepresented, the claimant is not absolved of all responsibility for making the record. *Johnson v. Barnhart,* 449 F.3d 804, 808 (7th Cir. 2006); 20 C.F.R. §§ 404.1512(c); 416.912(c). After all, "who is in a better position to provide information about his own medical condition...." *Bowen v.*

*Yuckert,* 482 U.S. 137, 146 n. 5 (1987). *See also Scheck v. Barnhart,* 357 F.3d 697, 702 (7th Cir.2004).

It is idle to suggest that the ALJ could have done anything to have adduced proof of Ms. Moore's medical condition prior to September 30 without her assistance. Where would she have looked? The necessary information was uniquely within Ms. Moore's knowledge. By doing nothing in the month following the hearing, Ms. Moore made it impossible for the ALJ to have fulfilled her promise of assistance, should it be needed. And, even though Ms. Moore is now represented by counsel, neither she nor her attorney have done anything to make the case. They have simply contented themselves with idle and irresponsible castigation of the ALJ. *Compare Nelms v. Astrue,* 553 F.3d 1093, 1098-99 (7th Cir.2009) (once represented, claimant gathered additional supporting evidence).

In the last analysis, Ms. Moore is solely responsible for the situation she now contends warrants a remand. But a party can hardly be heard to complain about the consequences of her own actions. *See Gevas v. Ghosh,* 566 F.3d 717, 719 (7th Cir.2009); *United States v. Goodwin,* 449 F.3d 766, 772 (7th Cir.2006)("It is in that sense that he is the author of the delay of which he complains."). What Justice Cardozo said in *R.H. Stearns Co. v. United States,* 291 U.S. 54, 61-62 (1934) applies equally here: "'He who prevents a thing from being done may not avail himself of the non-performance which he has himself occasioned, for the law says to him in effect "this is your own act, and therefore you are not damnified...."'"

Ms. Moore's request for a remand relies on an affidavit that is, at best, woefully inaccurate, and, at worst, filled with misrepresentations. Her presentation is a reckless one, *see Rogers v. Barnhart*, 446 F.Supp.2d 828, 835 (N.D.Ill. 2006)("The more troubling aspect of the argument is its resort to the 'ostrich-like tactic' of pretending that critical components of the record essentially do not exist. That tactic is as 'unprofessional ... [and] pointless" as ignoring

potentially dispositive authority that is contrary to one's contentions.'"), and her argument is easily rejected.

Two additional points need to be addressed. First, Ms. Moore says the ALJ failed to consider her obesity or her hypertension. (*Plaintiff's Brief*, at 11-13). Social Security Ruling 02-1p states that obesity should be used in determining whether the plaintiff's impairment meets or equals the requirements listed in the Commissioner's regulations. *SSR* 02-1p. However, although *SSR* 02-1p requires that an ALJ consider obesity, a failure to consider this obesity may be harmless, *Prochaska v. Barnhart*, 454 F.3d 731, 737 (7th Cir. 2006); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004), especially when a claimant fails to specify how her obesity further impaired her ability to work. *Skarbek*, 390 F.3d at 504.

Here, Ms. Moore says nothing about how her weight affected her ability to work prior to September 2003. Instead, she points out that generally, obesity can affect the ability to stand, walk, sit, lift, carry, push, or pull, citing SSR 02-1p. While that may be true in the abstract, the observation is pointless unless it actually applies to Ms. Moore's situation. As to that, all she can say is that her weight "*appears* particularly relevant . . . because painful sickle cell crises affected all her joints during the time at issue." (*Plaintiff's Brief*, at 11)(emphasis supplied).

*Only* she would know if it actually *did* exacerbate her condition at the time in question, but she seems hesitant to say it did. As already noted, the physicians treating her for sickle cell disease were well aware of her weight and still concluded in 2007, that she was capable of doing sedentary or even light work. According to the record her condition was worsening, and she was having more frequent crises as time passed, so clearly she would have been capable of light work despite her obesity in 2001-2003.

For the ALJ to have determined otherwise, despite the absence of any medical evidence, would have required the ALJ to engage in idle speculation or "play[ ] doctor." That, the ALJ cannot do. *See Simila v. Astrue*, 573 F.3d 503, 507 (7th Cir. 2009); *Rohan v. Chater,* 98 F.3d 966, 970 (7th Cir.1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").

Much the same can be said of Ms. Moore's hypertension. Throughout the record, it is characterized as asymptomatic, benign, or well-controlled. (*See, e.g.,* R. 181, 203, 458, 512, 514). It's never referred to as a contributing factor to any of Ms. Moore's problems, not even in the few pieces of evidence reflecting treatment for a crisis. The ALJ was right not to factor it into his analysis.

Finally, Ms. Moore faults the ALJ for his adverse credibility assessment. The argument is a bit confusing in its presentation. On the one hand, Ms. Moore says that the ALJ's credibility assessment was mere boilerplate based on nothing (*Plaintiff's Brief*, at 14), while on the other, she claims the ALJ improperly based his credibility finding on the objective medical evidence. (*Plaintiff's Brief*, at 15). This second theory is an accurate characterization of what the ALJ actually did (R. 19), but it is not a reason to overturn the decision. It is well-settled that an ALJ my compare a claimant's allegations with the objective medical evidence in assessing credibility because "discrepancies between the objective evidence and self-reports may suggest symptom exaggeration. *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010); *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008); *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005). Here, there was absolutely no evidence that Ms. Moore was disabled prior to September 2003.[5] In fact,

---

[5] It is no answer to say, as Ms. Moore does, that sickle cell disease "is particularly insidious because it rarely produces the objective medical evidence that clinicians desire." (*Plaintiff's Reply*, at 8 (quoting *Hines v. Barnhart*, 453 F.3d 559, 560-61 (4th Cir. 2006)). It is objectively verifiable, of course, but what is not objectively verifiable is the pain it can produce. *Hines*, 453 F.3d at 561. What is objectively verifiable are trips to a doctor or hospital for treatment when the disease becomes debilitating. It isn't necessarily disabling;some victims seldom have episodes; perhaps one every few years. (continued...)

given the nature of her condition and the opinions of her doctors in 2007, if the record suggests anything, it suggests she was not. As such, the ALJ's credibility assessment was not "patently wrong" and cannot be overturned. *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010); *Schmidt v. Astrue*, 496 F.3d 833, 844-45 (7th Cir. 2007).

Ms. Moore had to prove she was disabled – not merely that she had sickle cell anemia – before the expiration of her insured status on September 30, 2007. The ALJ explained this to her and also explained the benefits of having a lawyer. Even though the ALJ gave her every opportunity to do so, Ms. Moore chose to proceed on her own. She told the ALJ that she could not remember anything about the severity of her condition prior to September 2003 – *i.e.*, whether or when she experienced crises – she could look it up. The ALJ explained that any evidence from prior to that day could be important and gave Ms. Moore a month to come up with some. The ALJ said if she had any trouble, she should call the ALJ for help.

Ms. Moore never called, and so, the ALJ rendered her decision based, in large part, on a dearth of evidence from the critical period. Apparently, there was no evidence because Ms. Moore does not advert to any to support her claim that the ALJ left the record undeveloped. She does file an affidavit made up of mischaracterizations and falsehoods, but those don't win cases. The actual evidence from a few years after the expiration of Ms. Moore's insured status indicates she could perform light or sedentary work in 2007. While that still says nothing about what she could do in 2001-2003, her medical records depict a condition that was getting progressively

---

[5](...continued)
http://www.ncbi.nlm.nih.gov/pubmedhealth/ PMH0001554/. That may have been the case with Ms. Moore as there is no record of her seeking treatment for an episode in the critical period. And, as has been stated again and again, the record suggests that her episode went from rare to more frequent as the years passed.

worse.  In other words, she was more likely than not better off in 2001-2003.  While she might

be disabled now, that does not qualify her for DIB.

## CONCLUSION

The plaintiff's motion for summary judgment or remand [Dkt. 27]is DENIED, and the

Commissioner's motion for summary judgment is GRANTED.

**ENTERED:** _____

**UNITED STATES MAGISTRATE JUDGE**

**DATE:** April 6, 2012